Good morning, and may it please the Court. My name is Tim Hennessey. With me is Stephen Bloxam. We're here on behalf of the Cloverdale Rancheria of Pomo Indians and all the appellants in this case. I'd like to reserve four minutes for rebuttal. The Department of the Interior described its duty to the Cloverdale Rancheria in 1997 in its first Alan Wilson decision by the IBIA by saying, quote, This case concerns, in essence, the creation of a tribal entity from a previously unorganized group. In such a case, BIA and this Board have a responsibility to ensure that the initial tribal government is organized by individuals who properly have the right to do so. End quote. This case concerns the same thing, the same tribe in the same circumstances, and the Department bears the same responsibility. Well, but it did help the previously unorganized tribe organize, and after that, you're not in the same situation, right? If the tribe had been organized, you'd be correct. The allegations in the complaint are that the tribe has never organized. The tribe remains unorganized. Well, but not from the Federal government standpoint, right? There's a recognized governing body that the Federal government has had a government-to-government relationship with for years now. They do have a government-to-government relationship with a body that they deal with as the tribe's government. But at the same time, and consistently from the beginning up until this litigation started, it was their position always that the tribe had never organized. And what it means to organize — You say it's been their position. I'm sorry. Who's your antecedent? I beg your pardon? You say it's been their position from the beginning, the tribe never organized. Who's they in that sense? The Department of the Interior and the Bureau of Indian Affairs. I'm not sure that's right. That is to say, they have been dealing with the government that they helped set up. I guess we can hear from the government on the point, yeah. That is — I mean, in this litigation, they have taken the position that, oh, maybe the tribe did organize back then, either in 1996 or at some point between then and now. But in 2007, which was before the election that was the impetus for this case, they wrote a letter to counsel for the plaintiffs here saying, it is our position that the tribe has never formally organized under the IRA, the Indian Reorganization Act. And in 2008, the interim tribal counsel, which is who the government conducts their government-to-government relations with, that's the interim tribal counsel, the old one that was organized in — that was elected in 96, in order to organize the tribe, they submitted a constitution. And the Department of the Interior said, no, we can't accept that constitution. It wasn't submitted to us. It wasn't approved by the members of the Tilley-Hardwick class, who are, remember, the only people who were ever authorized to organize the tribe. In 2008, leading up to the election that led to the enactment of the constitution that we say did finally organize the tribe in 2008, the Department of the Interior worked with the Tilley-Hardwick class and the committee they put together, the Committee to Organize, in order to conduct this election to finally organize the tribe. All of that is — it's both consistent with the idea and reflects specific statements by the Department of the Interior saying, we don't consider the tribe to ever have been organized. And furthermore, there's a solicitor's memo also from 2008 saying, you know, with an analysis describing why certain actions taken by the interim counsel from 1996 weren't effective, why their purported expansion of tribal membership wasn't valid, why the governing documents that they purportedly put in place along the line weren't valid. And that was all because none of that stuff happened with the authority of the Tilley-Hardwick class, the only people ever recognized by the Department as having the authority to organize the tribe. I thought the election that brought the 96th Council — well, I won't say into being, but I thought that whatever election occurred that validated the 96th Council was confined under — I think it was under BIA supervision — was confined to the members of the Hardwick class, wasn't it? It was, yes. 127. Okay. So — right. So we have, at least initially, that governing body that the federal government then recognized was legitimately elected from your standpoint, right, in terms of the number — the people who were — had a say in electing those folks. Yes. To a point. Okay. What's that? To a point, meaning — Okay. What do you mean? Well, if you have a question, I don't want to interrupt, but — Well, no, I just — it seemed to me that's — it's one thing to get that governing body into existence and the federal government recognize it. It's a totally different question if they then start doing things that you think are illegitimate. But in terms of what the government committed to doing in terms of, you know, kind of a discrete, nondiscretionary duty, was to help with that initial setting up of a governing body that the federal government could recognize. And it seems to me that occurred — I don't know if it was in 96, 98. The dates are a little hard to keep straight, right? But way back, that happened. And then all of the things you're complaining about, it seems to me, go to just whether the actions that that governing body then took were or were not valid. But they don't have anything to do with the initial commitment that the federal government made to help — I thought of it as to help the tribe organize, but maybe you're saying that that's not — You're right. It is — it is exactly that, to help the tribe organize. And so they took some steps to fulfill that duty by supervising this 96 and 97 elections, which put in place this 96 interim council, which was there for the limited purpose of only organizing the tribe. The department's duty is not only to render that assistance, which it did, but to ensure that the ultimate organization of the tribe has occurred lawfully. That's the duty that they recognized in the Alan Wilson cases, and it's what the Hardwick order requires, the duty to ensure that the organization was lawful. So they put in place this interim organizing tribal council in order just to organize the But they never accomplished that. Instead, they went off the rails. They went rogue, as you say, in our brief, and they started doing other things, like expanding the membership. Let me get down to brass tacks in the following way. We've got an order from the district court here, from Judge Fogel, who says, well, you have two possible theories in which you can bring this action. One is that there has been no action whatsoever, and you're compelling action, but he said, Judge Fogel says, well, no, there's been action. They refused to go ahead, as you would like them to do. And the other theory is that they have a duty to perform some discreetly defined action, and he says, but I don't see the discreetly defined action. It's that second point that I think your argument is focusing on. Tell me what it is that is the discreetly defined action that qualifies for relief here. The discreet action The one that they're required to take? Mm-hmm. It's to ensure the lawful organization of the tribe. Is the word ensure, what's the, is that the right word? Well, ensure is the word that the IBIA used in Tilly Hardwick 1 at page 252, and that's quoted in our reply brief at page 13. Okay. And the way, the discreet action they need to take in order to accomplish that, in order to fulfill that responsibility, is to issue a reasoned decision on the tribe's request to recognize the results of the 2008 election. The tribe specifically requested that they put in this request saying, we have organized in our December 2008 election, now in order to fulfill your duty, tell us whether or not we have done so lawfully. Ensure that the organization that we say happened was lawful. Or if not, give us a reasoned explanation why not. Can you help me out with the terminology? Because I, well, I'm the first to confess and I am no expert in this very complicated area of the law. I guess I thought helping the tribe elect a governing body that the Federal Government would then recognize, that that, that was in essence fulfilling the Federal Government's obligation to help the tribe organize. If you're saying that's not true, what else do you have to do beyond that? Right. That's an important point. What it means to organize a tribe is different from what it means to elect a tribal governing body. Organizing the tribe is to enact a constitution or other governing document. Those are the words that are used in the Indian Reorganization Act at, I think it's 476A and 476H. And that's also in the regulations of 25 CFR Part 82. When they talk about an organized tribe, they're talking about a tribe with a constitution or other fundamental governing document. And that still has not happened for, for this tribe? Well, we say that it happened in December 2008, but otherwise it didn't, it hadn't happened prior to that. From the Federal Government's standpoint, that has never happened? In terms of something that the Federal Government's willing to recognize? Up until this litigation, that's correct. Now, I mean, by all means, ask them what their position is. It's unclear to us, but they seem to say, perhaps, that it has happened at some point. They have never made any sort of a final agency decision to that effect. Can you direct me to the language in the Hardwick Settlement that imposes the obligation? The Hardwick Order, it directs the Secretary of the Interior to recognize Point me to the precise language. Oh, sure. Give me a moment to check my notes. The Hardwick Order is in the record at 277. I've got it in front of me, so point me to the precise language. I'm not sure if I can find it right off the bat, but on rebuttal, I can point you to the paragraph. I think it may be paragraph 4, but that's a guess. I'm interested in not merely what the BIA might have said later, but I'm interested in the underlying obligation that's the source of that statement. I believe it's paragraph 4, and I think the language is something to the effect of that the Secretary of the Interior is directed to restore the tribe to the status it had prior to its termination. Okay. But in any event, you can do it on rebuttal. Okay. Thank you. Good morning, Your Honors. May it please the Court, Vivian Wong for the Department of the Interior. Plaintiff's narrative this morning in their briefing suggests that the Cloverdale Rancheria remains unorganized with no recognized leadership, and they suggest that the Federal government now must somehow establish leadership by recognizing plaintiffs. This narrative is just not borne out by the record or by the history of this tribe. In fact, as Judge Watford pointed out in your colloquy with counsel, after the Hardwick settlement, what that stipulation did was to restore the Indian status of these various groups, including Cloverdale. And what the Federal government, their obligation under that stipulation,    here. It was spelled out in the settlement agreement, was to assist the tribes with the organization of their initial government. And what that meant in this case was, and this is all detailed in the Alan Wilson subsequent litigation, is that the Department went and prepared what's referred to in the briefing as the Zuni Report, which is to identify which are the eligible members to vote and which are the eligible members to constitute the governing body of the tribe. And so the Department identified those members as the lineal descendants of these the original distributees of the Rancheria, and then those individuals were given notice of needing to go. I remember all that. Okay. And so then there's the vote, and the 96th council is elected. Correct. And is it your position that at that point the tribe is organized? The organization is a term of art in this, in the context of tribal law, and so I think what we want to be careful to say that that became the recognized governing body with which the Federal government then proceeds to conduct government-to-government affairs. It's different from the statutory provisions that my opponent was pointing to, which is 25 U.S.C. 476a versus 476h. That's under the Indian Reorganization Act, and it provides options, in a sense, for the tribe to proceed on how it wants to be reorganized. And under 476a, a tribe has the option to, their governing council can submit documents and request that the secretary review the Constitution, at which point there's, you know, various steps and regulations, but it becomes recognized. But in this circumstance, what the tribal council, the 96th council did was they, I think in their amicus brief, for example, explained that what they invoked is 476h, in which the Congress explicitly provided that these tribes retain their inherent sovereign authority, sovereign power, to adopt governing documents outside of that process. And so it is the Federal government's position, Your Honor, that there is a recognized body with which, you know, the council, the tribal council, which is the representative of the sovereign entity with whom we deal with. Roberts. Okay. But so can I ask this question? Recognizing that organize is a term of art. So is opposing counsel right in saying that organization doesn't occur for purposes of the IRA until a Constitution is produced that, I guess, the Federal government accepts or recognizes in some fashion? No. We — it depends on the tribe and depends on the circumstance. And in this particular circumstance, what happens is that the tribe produced their — organized themselves, produced their own organizing documents, and to this day are governed by their own Constitution, their own election ordinances. I thought that got rejected. Or, again, I'm — they can — the tribe can produce the document. But I thought the Federal government said, no, we're not recognizing this as legitimate. It's — it is a complex history in this case. But I believe that the document they're referring to was actually a Constitution that was submitted not by the 96th Tribal Council, which was the one that, in the And so, instead, formed their own group, had their own elections, submitted their own Constitution. And in that circumstance, you know, the Bureau of Indian Affairs said, look, I mean, we — we deal with the — the recognized governing council,   same way that the Tribal Council did. And that's — that's not you. Roberts. Okay. So your — your position, just to make sure I got it clear in my mind, your position is that whatever discrete nondiscretionary duties the Federal government had, they were fully discharged once the 96th Council was elected. And basically, after that, the Federal government said, we are done. We've done everything we promised you, the tribe, that we were going to do. And that's it. Yes, Your Honor, in part. That the — I think plaintiffs, in their briefing, identify or attempt to identify sources of what they label as discrete nondiscretionary duties. And one of those sources, they claim, is the Hardwick stipulation. And, yes, Your Honor, to that extent, to the extent that they allege that Hardwick is somehow an independent source of a continuing duty, a continuing command on Interior to act, then, yes, Interior absolutely discharged that duty when they assisted with the initial organization of the tribe. Now, you may be able to help me. I have read the Hardwick agreement, and I have trouble finding in the agreement language that comes very close to imposing an obligation to insure or even assist. But I gather, in the Alan Wilson case, that that's been — that agreement has been interpreted as saying the Board and the BIA have a responsibility to insure that the internal tribal government was organized by individuals who properly have a right to do so. And the word insure shows up in Alan Wilson 1. Help me understand how we get from language in the Hardwick settlement to that statement in Alan Wilson 1. Your Honor, in my — in my review of the Hardwick stipulation, I — I understand your point that there's not explicit language that says that. I think I'm about to hear from the other side that it really is paragraph 4. And I keep re-reading paragraph 4, and I keep trying to find some obligation undertaken by the Federal government to help organize or to insure organization. I can't find it. Well, neither can I, Your Honor. I agree that. I think that what the Alan Wilson decision suggested, and this is consistent with the Department's practice with all of the rancherias that were covered under the Hardwick stipulation, is that they recognize that, you know, for example, the stipulation discusses all of the matters about providing notice for opportunity to bring land into trust and all of these things. And I think the Department read that, you know, as — interpreted that in a sense as taking on, to the extent that there is any duty, taking on a duty to help the initial organization. But I would emphasize, Your Honor, the language that my opponent quoted and that you quoted just now that it's to insure the initial tribal government is organized. And I think initial is one of the key words here, which is that once — Okay. But I confess I have trouble getting out of paragraph 4. The only thing I get out of paragraph 4 is that the Department agrees to recognize. Well, maybe we infer from recognition that there is an implicit understanding or undertaking by the government that it will insure the initial organization. But I have to say that's a pretty big jump from the language of paragraph 4. But maybe Alan Wilson's enough to say that they've taken the obligation upon themselves. Okay. Does the government contest the obligation as described in Alan Wilson 1? I would say that that — our position is that to the extent that the Hardwick stipulation did create some sort of discrete enforceable duty, then that duty was discharged by the initial organization. I ask you a different question. Does the government agree that the obligation undertook in the Hardwick settlement is the obligation described in the quoted language from Alan Wilson 1? That language is, I'll repeat, do I and this Board have a responsibility to insure that the initial tribal government is organized by individuals who probably have a right to do so? Does the government have that obligation? Your Honor, we — our position would be that Interior did indeed take that as the obligation as identified in — in Alan Wilson. I understand that. And I'm not — that's not the question I asked. Does the government agree that it has that obligation? The obligation to assist with the initial tribal organization, yes. So I think the answer to my question is yes, that the sentence that I just read you from Alan Wilson describes in the government's view the obligation that the government has. I think you're trying to say had, and Judge Fletcher is saying has. You're just saying you did have it, but it's been discharged, right? That's correct, Your Honor. Oh, I'm fine then. I mean, what I want to understand is, did you at some time have that obligation? And then the question is whether you discharged it. The Department's position was that there was — that it did have an obligation. And yes, Your Honor, the Department did. And that that was the obligation as described in Alan Wilson 1. As described, yes, with the initial organization of the government. Okay. So I don't need to trouble myself by searching in the Hardwick settlement for such an obligation, because I can't find it there. Well, Your Honor, I think — I agree, Your Honor. But to the extent that plaintiffs argue that there's some continuing obligation to, after the initial organization, continue to revisit the issue — No, I got that part. I mean, I read the sentence. It says they have an obligation to ensure that there is initial tribal government. And once they've discharged that, they're done. Now, the question is, have they discharged it? Okay. I got it. Oh, I'm fine. Okay. Thank you, Your Honor. And I think, Your Honor, we, for example, in our briefing, referred to this circuit's decision in the Alvarado v. Table Mountain Rancheria case, which, although this is a tribe that was terminated and restored, and not under Hardwick, but the Court engaged in, I think, analysis that is helpful here, in which it explained how the stipulation restoring Indian status to that tribe and to the plaintiffs in that case did not provide the Court with continuing jurisdiction over plaintiff's dispute over subsequent tribal membership matters. And in the same way that subsequent tribal membership matters or subsequent tribal internal election disputes, in that same way, the Hardwick stipulation here does not impose some sort of nondiscretionary duty on Interior to continue, in the absence of any other explicit statutory duty to do so, to continue to revisit whether it continues to deal with the correct governing counsel. Can I ask you a question that maybe is not directly related to this, but it would give me some comfort if we were to rule in your favor here. Is there some other administrative mechanism that these plaintiffs could have pursued, maybe under the IRA, maybe under some other statute, to contest the continuing legitimacy of the 96 counsel? Well, plaintiffs do have remedies in terms of their dissatisfaction with how their elected leaders conduct tribal affairs. They do have remedies available under tribal law. And that's those are remedies that they have chosen not to avail themselves of, and instead they've come to Federal court. I think in part to address Your Honor's question, I think plaintiffs did also raise that perhaps whenever Interior is looking at a contract submitted under the ISDA. Put that aside. I'm not under the ISDA. I'm not definitely not talking about that. All right. I'm just talking about is there something else, some other mechanism. And I'll just give you the example I had in mind. I thought they had asked for, was it called a secretarial election? There was some election they asked for. The BIA, I think, said no. And then they just eventually withdrew their request, and so it rendered the appeal moot. I can't remember. That's what I was trying to get at. Is there some other way that they could have attacked the legitimacy of that counsel? They can attack it within their own tribal democratic processes. And I understand, Your Honor, looking for some sort of reassurance. But I think what we have here is that plaintiffs are displeased with the current state of tribal affairs, but that does not create a duty for the Federal Government to step in the middle of a sovereign entity's internal dispute. They keep referring to these sources of tribal law that they could. But I thought the very problem was that there was no recognized constitution that the tribe had been able to adopt. There were no tribal courts that the plaintiffs could go to to resolve this dispute. And so they're kind of stuck looking to you, to the Federal Government, for help. Well, that we disagree. They're not stuck, because there are actually the tribal the tribe does have a constitution. It was a constitution that was adopted by the governing counsel, the 96th counsel, and voted on by a majority of the members of the tribe. And that constitution provides dispute resolution mechanisms. It provides mechanisms for them to call for the tribe to hold special meetings and even includes provisions for recall of elected officials. And so those are all internal tribal mechanisms. They can avail themselves of that. They've chosen not to. And that is — but that's not enough to create some sort of duty for the Federal Government to step in. And this Congress and these courts have made clear that it is not for the Federal Government to interfere with the ranchería's ability to maintain itself as a culturally and politically distinct entity. They simply do not point to any — the cornerstone of Federal subject matter jurisdiction is statutory authorization. And that failure-to-act claim can proceed only if they can identify a discrete agency action required by Federal law, and they simply do not. Your Honor, I see my time is up. If you have no further questions. Roberts. Thank you very much. Mr. Hennessey. Thank you. There's a lot here that I want to address, but first I want to emphasize, remember, this is on motions to dismiss. And we're required to accept the allegations in the complaint as true. And there's a lot of factual disputes here about whether the tribe was organized, whether or not they have a constitution. My opponent mentioned that the tribe has a constitution. I'm not sure what she's referring to, but she might be talking about the one that was submitted to the Department of the Interior in 2007 and 2008, that, you know, submitted by the old interim tribal council that the Department of the Interior rejected and said, no, we can't accept this constitution. The point is, the allegations in the complaint and all of the documents submitted to the Department and attached to the complaint and incorporated into the complaint allege plausibly, more than plausibly, that the tribe has never been organized. And so that's the starting point, and that's what we have to remember. Those are the facts on which we have to judge whether or not we can make these claims to the district court. And I think we can. Now, as I'm reading Judge Fogel's order, he's clearly quoting from the complaint. But he's also quoting from various decisions for his factual background, Allen Wilson I, Allen Wilson II, and so on. I assume we can look at those as well? Yes. Please look at those. Those, I think, accurately enough reflect the historical facts of the tribe. So we're not confined merely to the complaint. We can judicially notice what's been held in those cases. Yes, absolutely. Your Honor was asking about the how the Allen Wilson, how the IBIA got from the Hardwick order to its --. I guess I don't need to know that anymore, because the government concedes that the obligation described in Allen Wilson I is the obligation that they're required to fulfill.   I didn't want to hear about the ISDA, but if you don't mind, I will mention it. That's another important part of this case, and it establishes a separate, specific statutory duty that the Interior Department has to fulfill. And that's essentially a result in the same thing as what we're asking you to do under our request to recognize the results of the 2008 election. Well, the reason, let me just tell you why I put that aside. I mean, in one, for one reason, it's that issue in the case. But the problem I have with your argument on that is that I read the ISDA as whatever duty it imposes upon the Federal government to act. It's only with respect to a contract proposal or whatever the thing is that it's called that's been authorized by the recognized government that the Federal government has a government-to-government relationship with. That at least is my problem with your argument, but let me hear what you have to say in response to that. That was the --. That's what the Interior Department argues, but it's not true. The contract proposal needs to be authorized by a tribe, and it needs to be submitted by a tribal organization, and the tribal organization is defined in the statute to be, first, the recognized governing body, but, second, a democratically elected body that represents the will of the people who it's going to serve. Right. And that's our tribal council. Yeah, but then under 450 --. I'm sorry. Go ahead. Under 450F, is it A2, right, it just, you know, if the contract proposal, if so, authorized by an Indian tribe under paragraph 1, then a tribal organization can submit it. That's why I say, okay, fine, that 2009 council or whatever we're going to call it might well be a tribal organization under the definition, but then doesn't it have to have been authorized by the preexisting governing body of the tribe to submit it to the federal government? No, not exactly. It has to be authorized by the tribe. It doesn't have to be authorized by the people that the department recognizes. But the tribe is recognized by the federal government, right? Well, the tribe is defined as a tribe that's acknowledged to exist as a tribe and is listed in the federal register as a list of 566 tribes. Coverdale Rancheria is a tribe. And we're saying, in this case, and these are the facts alleged and they have to be accepted as true, and they're supported by all the facts, that the people of the tribe are the Tilly Hardwick class up until it's organized. Those people are the only people the department has ever decided are authorized to speak on behalf of the tribe. And those people elected the 2009 council to represent them. And the 2009 council submitted this contract proposal and, for that matter, brings this suit in the name of the tribe. And that's why they're authorized to do that, too. Can I ask you this, just as a general matter? Sure. When the federal government recognizes an Indian tribe, does it always have to do so by recognizing a particular, you know, governing body as some unit within the tribe that has the authority to speak on the tribe's behalf? That's a good question. And I don't know the answer, but I don't think so. I believe that a tribe, well, I don't want to speculate. How do you establish a government-to-government relationship with an entity that doesn't have a government? That's what I, that's why I don't think your reading of the statute is right. It says it's got to be authorized by an Indian tribe. And then the statute defines Indian tribe as an entity that the federal government has recognized. An entity of the federal government acknowledges as existing as an Indian tribe. The acknowledgment process is very different from the government recognizing one governing, one government or another of a tribe or any particular people who represent the tribe. Although I think the answer to Judge Watford's question may be inferred from the jump that was made between Paragraph 4 and Alan Wilson 1, because Paragraph 1 says, the Secretary shall recognize the Indian tribes. And then that jumps us to Alan Wilson 1, which says the government has an obligation to ensure that there is an initial government. That's, that's right. That is to say, it sounds as though we infer from the recognition that there has to be a government that's capable of accepting the recognition or being recognized. A government that's capable of being dealt with back and forth with the Department of the Interior in the U.S. That's right. The, lots of cases have recognized that the federal government has a duty to deal when it's dealing with the tribe, to deal with the people, the representatives who are, you know, represent the will of the tribal members. That's recognizing the tribal government, acknowledging the tribe. It's the first step, recognizing the tribal government is the second step. Like in this case, deciding whether or not the tribe was initially organized is the first step, and that's what we want to get the department to do. And then after that's done, you've got a body of tribal law on which you can decide, you know, the tribe can decide for itself at that point with its constitution who its government is. Okay. Thank you.  We've taken you over time for which we apologize. The case of Cloverdale Rancheria Pomo Indians of California versus Salazar is now submitted for decision.
judges: Tashima, Rawlinson, Clifton